**ESTATE OF Helen GAWEL, Deceased, By and Through Gerald GAWEL, Personal Representative, Plaintiff,**

v.

**Ivan C. SCHATTEN, M.D., Defendant.**

**No. 98-CV-75279.**

United States District Court, E.D. Michigan, Southern Division.

Aug. 16, 2000.

Alan S. Wittenberg, Lopatin, Miller, Freedman, Bluestone, Herskovic, Heilman & Domol, Southfield, MI, for Plaintiff.

Michael J. Rinkel, Susan J. Zbikowski, Siemion, Huckabay, Bodray, Padilla, Morganti & Bowerman, P.C., Southfield, MI, for Defendant.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO STRIKE EXPERT WITNESS

COHN, District Judge.

### I. Introduction

This is a medical malpractice case under Michigan's Wrongful Death Act, M.C.L. § 600.2922. Plaintiff, Gerald Gawel, the representative of the estate of the deceased Helen Gawel (Gawel), claims that defendant, Ivan C. Schatten, M.D. (Dr. Schatten) was negligent in failing to diagnose and treat Gawel's coronary artery disease and mitrovalvular disease despite the tell-tale signs in Gawel's medical history. As a result, plaintiff says that Gawel had to undergo cardiac surgery and mitrovalve replacement after an acute miocardial infarction, which lead to cardiac arrest and ultimately, to Gawel's death.

Before the Court is defendant's motion to strike plaintiff's expert witness, Alvin Shapiro, D.O. (Dr. Shapiro) on the grounds that Dr. Shapiro is not qualified under Michigan law because at the time of the occurrences which form the basis of the complaint, Dr. Shapiro was not engaged in the active clinical practice of medicine nor did he devote a majority of his professional time to the instruction of students in an accredited health professional school.

### II. Facts

The material facts as gleaned from the parties' papers follow.

#### A.

Helen Gawel was born on June 27, 1920. She treated with Dr. Schatten from November 21, 1988 until 1995. Gawel suffered from, and was apparently treated by Dr. Schatten for diabetes, epilepsy, and obesity. Dr. Schatten retired in the fall of 1995. On November 30, 1995, Gawel underwent an angioplasty due to triple vessel disease. On December 11, 1995, she went to the hospital complaining of shortness of breath and chest pain. Gawel was diagnosed with a coagulation abnormality and was transferred to a nursing center. On July 11, 1996, Gawel underwent a pericardial window, which showed significant coronary artery disease, mitrovalve insufficiency, and pneumonia. On July 12, 1996, Gawel underwent mitrovavle replacement surgery. On July 17, 1996, Gawel experienced cardiac arrest and declined in health until her death on July 26, 1996.

#### B.

Plaintiff filed this case in November of 1998 in Wayne County Circuit Court. Defendant removed the case to federal court on December 14, 1998 on the basis of diversity jurisdiction.[1] See 28 U.S.C. § 1332. On October 27, 1999, plaintiff filed a disclosure of expert witness, revealing its intention to rely on the expert testimony of Dr. Shapiro, who is expected to testify that

1. Plaintiff is a citizen of Michigan, defendant is a citizen of California, and the amount in controversy exceeds $75,000.00.

defendant breached the standard of care in failing to diagnose and treat Gawel's coronary artery disease. A pre-trial conference was held on June 27, 2000, at which time defendant indicated his intention to file a motion to strike plaintiff's expert witness, Dr. Shapiro.

### III. Analysis

#### A. The Statute

Michigan law governing the qualifications of an expert witness in a medical malpractice action is stated in M.C.L. § 600.2169, which reads in part:

(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c), **during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted *a majority of his or her professional time*[2] to either or both of the following:**

(i) **The active clinical practice of the same health profession** in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is

a specialist, the active clinical practice of that specialty.

(ii) **The instruction of students in an accredited health professional school or accredited residency or clinical research program** in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

.      .      .      .      .

(2) In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:

(a) The educational and professional training of the expert witness.

(b) The area of specialization of the expert witness.

(c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.

(d) The relevancy of the expert witness's testimony.

.      .      .      .      .

(emphasis added). Section 2169 is an enactment of substantive law. *See McDougall v. Schanz*, 461 Mich. 15, 35, 597 N.W.2d 148 (1999). A federal court sitting in diversity jurisdiction must follow its requirements. *See Slifcak v. Northern Mich. Hosp., Inc.* 1991 WL 626469 (W.D.Mich. Aug.20, 1991) (unpublished); *see also Golden v. Baghdoian*, 222 Mich.App. 220, 564 N.W.2d 505 (1997), and the parties do not dispute this. At issue is the language in M.C.L. § 600.2169 (1)(b)(i) and (ii), emphasized above. Specifically, the Court must determine what constitutes "a majority of his or her professional time" for qualification as an expert witness.

---

**2.** M.C.L. § 2169 was amended in 1993. Prior to the 1993 amendment, the statute, as enacted in 1986, required that the expert "devotes, or devotes at the time of the occurrence which is the basis for the action, *a substantial*

*portion* of his or her professional time to the active clinical practice of medicine ... or to the instruction of students in an accredited medical school ..." (emphasis added).

## B. The Parties' Positions

Defendant argues that because Dr. Shapiro retired from the active clinical practice of medicine in November of 1993 and because his sole employment is teaching 8 to 10 hours per week at Nova Southeastern University of Applied Health Services, he does not meet the requirements of § 2169 (b) (i) or (ii), *i.e.* he does not devote a majority of his professional time to teaching. Defendant also argues that to the extent that plaintiff alleges acts of wrongdoing going back as far as 1992, those acts are time barred.

Plaintiff says that for the sake of argument on this motion, it will concede that any acts of wrongdoing prior to November of 1993 cannot form the basis of a malpractice claim. However, plaintiff says that Dr. Shapiro is qualified under the statute. Since his retirement from the active practice of medicine in 1993, Dr. Shapiro has taught and continues to teach at an accredited health professional school. While Dr. Shapiro teaches only 8 to 10 hours per week, he spends *a majority of his professional time* teaching, although he is not a full-time instructor. Thus, Dr. Shapiro meets the statutory requirements for an expert witness in a medical malpractice case.

## C. The Meaning of "a majority of his or her professional time"

### 1.

Since his retirement in 1993,[3] it is undisputed that Dr. Shapiro has taught medical students at an accredited university. While Dr. Shapiro lectures only 8 to 10 hours a week, he spends an additional 30 hours per week in preparation. *See* Defendant's Ex. A - deposition of Dr. Shapiro at p. 66. Whether this amount of time constitutes a majority of his professional time under the statute presents a question of statutory interpretation as to the meaning of the phrase "a majority of his or her professional time." According to defendant, the Court should take a restrictive view of the statutory requirement that an expert devote a "majority of his or her professional time" and find that a part-time medical instructor, teaching 8-10 hours per week, is not qualified.[4] In other words, defendant would have the Court interpret the language "a majority of his or her professional time" as requiring full time employment as either a practicing physician or teacher.

### 2.

■ The Michigan courts have not addressed this precise question.[5] To the extent that legislative history is relevant as an aid to statutory interpretation, in *McDougall v. Schanz,* 218 Mich.App. 501, 510 n. 1, 554 N.W.2d 56 (1996), *rev'd, McDougall v. Schanz, supra,* Judge Clifford Taylor, now Justice Taylor, in a dissenting opinion, quoted the following excerpt from a Michigan Senate report regarding the expert witness requirements:

> As a practical matter, in many courts merely a license to practice medicine is

---

**3.** The Court will assume, as do both parties, that only acts of wrongdoing that occurred after November of 1993 may be asserted. Thus, 1993 is the date of the occurrence for purposes of section 2169.

**4.** Defendant's argument that Dr. Shapiro is not qualified because he has not seen a patient since 1993, is not well received. Section 2169 clearly states that a expert is qualified if they devote a majority of their professional time to *either or both* actively practicing medicine or teaching.

**5.** When deciding a diversity case under state law, a federal court must apply the law of the state's highest court. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If, however, the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from "all relevant data." *Garden City Osteopathic Hospital v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir.1995) (citing *Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985)). *See also* C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 4507 (2d ed. 1982).

needed to become a medical expert on an issue.

This has given rise to a group of national professional witnesses who travel the country routinely testifying for plaintiffs in malpractice actions. These "hired guns" advertise extensively in professional journals and compete fiercely with each other for the expert witness business. For many, testifying is a full-time occupation and they rarely actually engage in the practice of medicine. There is a perception that these so-called expert witnesses will testify to whatever someone pays them to testify about.

**This proposal is designed to make sure that expert witnesses actually practice or teach medicine.** In other words, to make sure that experts will have firsthand practical expertise in the subject matter about which they are testifying. In particular, with the malpractice crisis facing high-risk specialists, such as neurosurgeons, orthopedic surgeons and ob/gyns, this reform is necessary to insure that in malpractice suits against specialists the expert witnesses actually practice in the same speciality. **This will protect the integrity of our judicial system by requiring real experts instead of "hired guns."**

Report of the Senate Select Committee on Civil Justice Reform (Sept. 26, 1995) (emphasis added).

■ Thus, the stated legislative purpose behind the expert witness requirements is to avoid having "hired guns," physicians who testify as expert witnesses for hire and neither practice nor teach medicine, *i.e.* professional expert witnesses. Given that § 2169 is aimed at preventing professional expert witnesses, it does not appear that the legislative intent would be served by interpreting the language "a majority

of his or her professional time" to require full-time employment. As such, defendant's argument fails.

### 3.

■ There is another reason for rejecting defendant's position in favor of a flexible approach to the statutory requirements. In 1993, the Michigan legislature enacted a series of tort reform measures in medical malpractice cases, including the provision on expert witnesses. *See* 1993 P.A. No. 78. The overall goal of the tort reform measures was to deter frivolous medical malpractice claims. *See Vanden-Berg v. VandenBerg,* 231 Mich.App. 497, 502, 586 N.W.2d 570 (1998). Because the statutory requirements constrain a plaintiff's ability to present his or her case to a jury, the requirements should be broadly interpreted.[6] Indeed, as evidenced by the instant motion, the requirements provide another avenue for a defendant to obtain dismissal or otherwise impede a plaintiff's case before there is a review on the merits of his or her claims.

### 4.

■ From the above discussion, it follows that an expert devotes "a majority of his or her professional time" and is qualified under the statute where he or she spends the bulk of their *professional* time, as opposed to *recreational* or other *personal* time, engaged in either the active practice of medicine or teaching. He or she may be qualified as an expert even if they are professionally employed part time, provided they spend a majority of that professional time either practicing medicine or teaching. In other words, a proposed expert who spends a majority of their professional time engaged in other professional pursuits, including testifying

---

**6.** Florida, like Michigan, has enacted a medical malpractice statute the purpose of which "is to alleviate the high cost of medical negligence claims through early determination and prompt resolution of claims ...." *Weinstock v. Groth,* 629 So.2d 835, 838 (Fla.1993). The Florida courts have consistently interpreted the statutory requirements "in a manner that favors access to the courts." *Patry v. Capps,* 633 So.2d 9, 13 (Fla.1994); *Davis v. Orlando Regional Medical Center,* 654 So.2d 664 (Fla. Dist.Ct.App.1995).

as an expert witness, would not be qualified. That is not to say, however, that a physician who testifies frequently as an expert is not qualified; he or she must simply spend more of his or her professional time either practicing medicine or teaching. Such an interpretation is in keeping with the legislative purpose in avoiding professional expert witnesses and is in harmony with a plaintiff's right to jury trial guaranteed by the Seventh Amendment. Under this interpretation, Dr. Shapiro is qualified as an expert witness under § 2169 as it is clear that he spends a majority, and indeed all, of his *professional time* teaching.

### 5.

Defendant suggests that if some temporal limits, *i.e.* number of hours worked, are not read into the statute, then a physician who spends only an hour a week on his or her profession would be qualified. This argument, however, speaks to the credibility of the medical expert, not whether he or she is qualified. The statute does not impose any minimum temporal limitations, and the Court will not impose any.

### IV. Conclusion

For the reasons stated above, defendant's motion is DENIED.

SO ORDERED.