No. 88,077

MARIAN E. DAWSON, *Appellant*, v. DR. SANDRA PRAGER, M.D.,
and THE MENNINGER CLINIC, INC., *Appellees*.

(76 P.3d 1036)

Opinion filed September 26, 2003.

*Rebecca M. Randles*, of Evans & Mullinix, P.A., of Shawnee, argued the cause and was on the briefs for appellant.

*Gerald L. Goodell*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., argued the cause, and *Curtis J. Waugh* and *Marta Fisher Linenberger*, of the same firm, were with him on the brief for appellees.

The opinion of the court was delivered by

BRAZIL, S.J.: Marian Dawson sued Dr. Sandra Prager and The Menninger Clinic, Inc. (Menninger), alleging negligence and other

wrongs in her psychiatric care and treatment. Defendants counterclaimed for unpaid medical bills. On defendants' motions, the trial court entered summary judgment on all issues against Dawson and in favor of defendants. Dawson appealed. The court transferred the case from the Court of Appeals. See K.S.A. 20-3018(c).

Marian Dawson filed this lawsuit against Dr. Prager and Menninger in June 1997. Against Dr. Prager, Dawson alleged medical malpractice, negligent infliction of emotional distress, breach of fiduciary duty, money had and received, and outrage. Against Menninger, Dawson alleged medical malpractice, breach of nondelegable duty, negligent infliction of emotional distress, and money had and received.

Dawson alleged that Dr. Prager treated her between October 1993 and June 1995. Dawson alleged that Dr. Prager, who was a resident, did not have the professional experience to treat her severe psychiatric problems and should not have undertaken her diagnosis and treatment. Among other allegations against Dr. Prager, Dawson alleged that the doctor did not provide her with a safe environment in which she would be protected from self-inflicted injury. According to Dr. Robert Simon, the plaintiff's designated expert witness on psychiatric matters, Dawson burned herself approximately 10 or more times in March, April, and May 1995. Dr. Simon testified that Dawson burned herself both at Menninger and while on passes from the facility.

Dawson alleged that Menninger failed to protect her from self-inflicted injury and failed to adequately supervise Dr. Prager.

Against both Dr. Prager and Menninger, Dawson alleged a cause of action for money had and received. Dawson sought to have the money she paid for treatment and care returned to her based on improper care.

Menninger filed a counterclaim for unpaid medical bills of $69,219.17.

The district court granted defendants' motion for partial summary judgment on all Dawson's claims except medical malpractice.

After deposing Dr. Simon, defendants sought summary judgment on the medical malpractice claim on the ground that Dawson's designated expert witness on standard of care did not spend

at least 50% of his professional time in actual clinical practice for the 2 years preceding the incident giving rise to the cause of action, as required by K.S.A. 60-3412. In response, Dawson filed an affidavit by Dr. Simon. Defendants requested that the affidavit be stricken. The district court ordered the affidavit to be stricken and granted summary judgment against Dawson and in favor of defendants.

The district court and the parties treat the district court's entry of summary judgment based on Dr. Simon's lack of qualification as finally disposing of all claims in this case. Expert testimony is necessary to prove a deviation from the standard of care by a health care provider where normal experience and qualifications of laypersons serving as jurors would not permit them to draw proper conclusions. *Pope v. Ransdell*, 251 Kan. 112, 120, 833 P.2d 965 (1992). In the present case, where it appeared that expert testimony would be necessary, the time in which Dawson was required to designate her expert witness was expired. Although no express finding was made by the district court that Dawson's case could not be made without expert testimony on the standard of care, it reasonably may be inferred from the district court's entering final judgment that it believed an expert witness was indispensable.

Dawson has not raised the district court's refusal to allow additional time for her to designate an expert witness as an issue on appeal.

## PLAINTIFF'S EXPERT ON STANDARD OF CARE

K.S.A. 60-3412 provides:

"In any medical malpractice liability action, as defined in K.S.A. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed."

The statute "is intended to prevent the use of 'professional witnesses.' That is, practitioners of healing arts who spend less than 50 percent of their professional time in actual clinical practice in their profession are considered to be 'professional witnesses' rather

than practitioners of their profession." *Wisker v. Hart*, 244 Kan. 36, 43-44, 766 P.2d 168 (1988). If, as here, the district court's decision to admit expert testimony is based upon an interpretation of the statute, the court has de novo review. *Endorf v. Bohlender*, 26 Kan. App. 2d 855, 860, 995 P.2d 896, *rev. denied* 269 Kan. 932 (2000).

In a written Memorandum Decision and Order, the district court concluded that under K.S.A. 60-3412 Dr. Simon was not qualified to testify on the standard of care because he spent less than 50% of his professional time during the 1993 to 1995 time period in actual clinical practice. The district court looked to *Endorf* for the meaning of "actual clinical practice." In that case, the Court of Appeals rejected the contention that administrative and academic pursuits and research would satisfy the statutory requirement of actual clinical practice. The Court of Appeals concluded:

" 'Actual clinical practice' means patient care. However, patient care should not be limited to a physical presence or bedside requirement. For example, here, Dr. Bohlender was criticized by Dr. Barish for failing to call Poison Control. Had such a call been placed, the physician in Poison Control advising the emergency room doctor on patient care would be engaged in patient care and thus in actual clinical practice. In this technological age of video teleconferencing, and the like, the practitioner of healing arts advising on, or addressing care for, a distant patient is engaged in actual clinical practice." 26 Kan. App. 2d at 865.

The district court's conclusion that Dr. Simon spent less than 50% of his professional time during the 1993 to 1995 period in patient care was based on Dr. Simon's deposition testimony, which was given in January 2000. When asked if he agreed that at the time of the deposition he spent less than half his time in actual clinical practice, as defined by defendants' counsel, Dr. Simon answered affirmatively. When asked about 1993 to 1995, Dr. Simon said that it was "[p]robably true then too."

Dawson contends on appeal, as she did in the district court, that Dr. Simon's answers would have satisfied the statutory requirement if defendants' counsel had not defined actual clinical practice too narrowly. The district court considered and rejected the argument:

"The crux of Plaintiff's argument is that Dr. Simon was misled in that Defendant limited Dr. Simon's response to 'patient care' meaning 'direct work with treating patients.' However, although Defendants' counsel made such initial statement, it is clear that Dr. Simon included in his figure the amount of time spent on advising on and addressing patient care needs and other peripheral duties relating to actual patient care. . . . Defendants' counsel continually clarified what was actual clinical practice and gave Dr. Simon many opportunities to explain everything he does so there would be no guessing game on what portion of Dr. Simon's time is spent on clinical practice. As an example of the broad range of patient related activities included in the time Dr. Simon figured as actual clinical practice, the following colloquy took place between Dr. Simon and Defendants' counsel:

'Q. . . . All Right. Now, again talking about actual clinical practice and I have a loosely defined that as actual patient care —

'A. Let me ask you this if I may, counsel, I also consult to Suburban's outreach program to the social workers that go out and follow up on patients who have been admitted and discharged from Suburban, both psychiatric and non-psychiatric; it's in regard to their emotional needs. I do consultation on that. I don't know if you want to consider that direct patient care or not, but I do, do that as well.

'Q. Sure. What I want from you, really, doctor, is describe your clinical practice in terms of patient care and —

'A. That would qualify I think.

'Q. Can you give me a sense of the hours?

'A. Of that?

'Q. Yes.

'A. That would only be one hour a month, yeah.

'Q. Okay.

'A. I do some inpatient supervision. That's about an hour a month as well.'

"In addition, on various occasions Dr. Simon was asked the percentage of time he spends on clinical practice now and in the 1993-1995 time period and responded, for example as follows:

'Q. Is it fair to say that you spend less than half your time currently treating outpatients?

'A. That's true.

'Q. All right. Now in '93, '95 is it fair to say that you spent less than half your time treating outpatients?

'A. Yeah, I think that's correct.

'Q. Okay. Now, I used the term actual clinical practice and defined that as patient care earlier?

'A. Yes.

'Q. Would you agree that you spend less than half your time now in actual clinical care as I have defined it?

'A. Yes.

'Q. And what about in '93, '95?

'A. Probably true then too.'

"Again, although Plaintiff had counsel present at the deposition which could have attempted to clarify any testimony, it was Defense counsel who attempted to make certain the testimony of Dr. Simon was clear and accurate, asking:

'Q. Let me do the proverbial one more question, which is to go back to when I asked about how you split up your work and how much time was spent on different things.

'A. I know what you are going to ask me now.

'Q. Not necessarily.

'A. I do.

'Q. We talked about actual clinical practice, meaning actual patient care, and you gave me some figures on what you did with outpatients and then also your writing and research and scholarship and university work and all. I believe your testimony was that, with your outpatient care today and then also back in 1993, '95, the period at issue in this lawsuit, that less than half your time was spent in clinical outpatient care?

'A. Right.

'Q. My question is was less than half your time spent with patient care now and back then?

'A. Was —

'Q. Do you spend less than half of your time today —

'A. Yes.

'Q. — on patient care?

'A. Yes.

'Q. What about '93,'95?

'A. Yes.

'Q. Less than half your time —

'A. Yes.

'Q. —was spent on patient care?

'A. Yes.

'Q. As we have defined it?

'A. Right.

'Q. The reason I ask you again, quite frankly, is that we have talked about outpatient care you have provided in what you described in your office over here, and I wanted to broaden that if you are talking about other patients because you said you were in hospitals and you described a number of other contexts. Even in those other contexts, back in '93 and '95 and today, it's your testimony that less than half of your time is spent with patient care?

'A. Unless I have four or five admissions on a unit. Then it's 10, 15 hours, 20 hours per admission, but that hasn't happened for a while. If you get a bunch of hospital admissions, then your hours go up.

'Q. Or they don't and they go down?

'A. And don't, and you don't have them.

'Q. On the average?
'A. Right, is less.
'Q. Both now, January 2000, and also back in '93 to '95?
'A. Yes, I think that's accurate.
'Q. Less than 50 percent?
'A. Right.'

"It is clear Dr. Simon included in patient care the time spent consulting, supervising, admitting patients, and other various duties associated with patient care. In addition, it is clear the definition provided by Defendants' counsel was not limited to outpatient care as Plaintiff contends. After consideration of the deposition as a whole, and the fact that Plaintiff had counsel present who could have cross-examined Dr. Simon or clarified the issue, and the fact Dr. Simon did not provide corrections on his errata sheet, the Court finds Dr. Simon testified that his time spent in actual clinical practice, or patient care under the meaning discussed in *Endorf*, is not at least 50% as is required by K.S.A. 60-3412, and as such [he is] not qualified to testify as an expert on the standard of care in this matter."

On appeal, Dawson reiterates the position she took in the district court. In particular, she complains that the definition defendants' counsel used in questioning Dr. Simon excluded indirect patient care from "actual clinical practice." As the district court observed, although defendant's counsel focused on direct patient care, he also told the witness that indirect patient care, such as consulting with social workers who follow up with patients discharged from Suburban Hospital, qualified as actual clinical practice.

Examination of Dr. Simon's testimony about his professional activities shows that he included indirect patient care in his computation of time spent in patient care.

The only period of Dr. Simon's activities that is relevant under K.S.A. 60-3412 is the period 1993 to 1995, but the deposition contains a more thorough discussion of the range of Simon's professional activities in 2000. In consequence, the testimony about 1993 to 1995 is more readily understood in light of the testimony about 2000. For this reason only, the testimony about Simon's professional activities in 2000 is set out here.

With regard to his activities in January 2000, Dr. Simon testified that he engaged in the following types of direct and indirect patient care:

outpatient care                            5-10 hours/week
group therapist/partial hospitalization     2-3 hours/week

| emergency room on call | 2-4 times/month—no estimate of time |
|---|---|
| federal government consulting | no estimate of time |
| consult with social workers | 1 hour/month |
| inpatient supervisio | 1 hour/month |

Dr. Simon testified that he devoted at least 10 hours per week to writing and editing and approximately 20 hours per week to legal consulting. Simon did not estimate the time he spent in his other January 2000 professional activities that did not involve patient care—his directorship of the program of psychiatry and law at Georgetown and his involvement with professional organizations and committees. Thus, in January 2000, for those activities that Simon estimated time spent, he did direct and indirect patient care less than 15 hours per week and nonpatient pursuits approximately 30 hours per week.

For the period 1993 to 1995, the 2 years preceding the incident giving rise to the action, Dr. Simon testified that he spent approximately 20 hours, perhaps more, per week in outpatient care. He stated that, unlike in January 2000, in the earlier period he was not taking emergency room on-call duty, he was not doing group therapy/partial hospitalization work, he was doing less consulting with the hospital, and he was doing less inpatient and partial hospitalization supervision. He did not mention federal government consulting during the 1993 to 1995 period.

Hence, in the earlier period, Dr. Simon did not engage in the types of indirect patient care that took the greatest amount of his time in January 2000. In the earlier period, according to his testimony, his indirect patient care activities consisted only of consulting with the hospital and inpatient and partial hospitalization supervision. Dr. Simon's only testimony about the amount of time spent in those activities was that it was less than at the time of the deposition. His estimate of the time he spent in those activities at the time of the deposition appears to be approximately 2 hours per month. Fewer than 2 hours per month in indirect patient care does not meaningfully affect the computation of Dr. Simon's professional activities for purposes of K.S.A. 60-3412. Thus, contrary to Dawson's contention, when defendants' counsel asked Simon what percentage of his professional time he spent in 1993 to 1995 in

outpatient care, the question did not significantly narrow the scope of the witness' actual clinical practice activities.

Dr. Simon estimated the percentage of his time with outpatients in 1993 to 1995 at "probably 30 to 40 percent." As noted by the district court, each time Simon was asked about the fraction or percentage of his professional time spent in 1993 to 1995 in actual clinical practice or patient care, he testified that it was less than half his time or less than 50%.

Twenty hours per week is 50% of a 40-hour workweek. When Dr. Simon stated that 20 hours per week of outpatient care amounted to approximately 30 to 40% of his professional time, he was not calculating the percentage on a standard 40-hour week. If 20 hours of outpatient care was 30% of his professional time, his workweek would be 67 hours ($20/.3 = 66.6666$). If 20 hours was 40%, his work week would be 50 hours ($20/.4 = 50$). Dr. Simon was asked, "You said 20 hours, a 40-, 50-hour week?" He answered, "Maybe it was more."

Dawson directs the court's attention to similar statutory schemes in four other states that qualify standard of care witnesses on the ground that a certain portion of time is spent in clinical practice. She notes that "[d]espite the simple elegance" of these statutes each of these states have had questions arise in construing their statutes, including the way to count hours to assess the percentage of time the experts spent in their clinical practice.

We note two cases, one from Michigan and one from North Carolina, that when compared to the present case, would seem to have anomalous results

In *Estate of Gawel ex rel. Gawel v. Schatten*, 109 F. Supp. 2d 719 (E.D. Mich. 2000), plaintiff designated as expert witness a Dr. Shapiro who had retired from the active clinical practice of medicine to teach 8 to 10 hours per week at a university of applied health services. Defendant urged the court to interpret the statutory phrase, "a majority of his or her professional time," as requiring full-time employment. 109 F. Supp. 2d at 722. The district court declined to do so on several grounds. First, requiring full-time employment would not serve the legislative purpose of banishing "hired guns." Second, requiring full-time employment

would be contrary to the rule of statutory construction that prescribes the broad interpretation of statutory requirements that constrain access to the courts. Third, the number of hours a medical expert spends on his or her profession goes to credibility rather than qualification. 109 F. Supp. 2d at 723-24.

In *Coffman v. Roberson*, 153 N.C. App. 618, 571 S.E.2d 255 (2002), it was noted that the North Carolina evidentiary rule requires a medical expert witness, in the year immediately preceding the occurrence, to have devoted a majority of his or her professional time to active clinical practice or the instruction of students. The court held that a retired physician who, as a volunteer, taught in an accredited medical school was qualified to testify because, even though he spent little time teaching, his teaching time constituted 100% of the time he devoted to professional pursuits.

Even though the experts in these two cases apparently devoted less than half the number of hours to legislatively-approved activities that Dr. Simon spent in this case, they were qualified to testify as experts and Dr. Simon was not.

However, just as in Michigan and North Carolina, if it were shown that Dr. Simon devoted 8 to 10 hours per week to "actual clinical practice" and that constituted at least 50% of his professional time, he would have been qualified to testify under K.S.A. 60-3412.

It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in it. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 378, 22 P.3d 124 (2001) (citing *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 [1998]).

It might be argued that our construction of the statute leads to unreasonable results. The legislature is presumed to intend that a statute be given a reasonable construction, so as to avoid unreasonable or absurd results. *Bennett v. Van Doren Industries, Inc.*, 262 Kan. 426, 433, 939 P.2d 874 (1997).

However, ordinary words are to be given their ordinary meaning, and a statute should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it. *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 316, 22 P.3d 600 (2001).

If, for example, we were to conclude that 20 hours represents 50% of a 40-hour workweek, Dr. Simon would be qualified to testify under the statute. But we would be adding something to the statute as written, and that is a legislative function.

Under the clear and unambiguous wording of K.S.A. 60-3412, Dr. Simon did not spend at least 50% of his professional time devoted to actual clinical practice in the 2-year period preceding the incident giving rise to the present action and was not qualified to testify on the standard of care.

## DR. SIMON'S POST-DEPOSITION AFFIDAVIT

Dr. Simon was deposed in January 2000. In mid-April 2000, he prepared an affidavit on the subject of the time he spent in professional pursuits. After it was filed in the district court, defendants sought to have the affidavit stricken on the ground that it contradicted Simon's deposition testimony. The district court agreed: "Dr. Simon's affidavit in direct contravention of his deposition testimony should be and is stricken. Although Dr. Simon's affidavit states he is a full time clinical psychiatrist, this does not mean his time is spent 'full time' on actual clinical practice as defined by Kansas law."

Dawson's principal contention is that an affidavit is an appropriate means for supplementing deposition testimony, and that Simon's affidavit was intended to supplement and clarify his deposition testimony rather than contradict it.

Examination of the affidavit reveals very limited references to Simon's activities during the period 1993 to 1995. The two affidavit

statements specific to the relevant period assert that Simon devoted more than 50% of his professional time in 1993 to 1995 to actual clinical practice:

"During the two years prior to the events involved in this lawsuit, my clinical practice accounted for more than fifty percent of my professional time as well."

"During the two years preceding the events in this lawsuit, I had a greater outpatient load and more inpatients. My clinical practice during those two years exceeded fifty percent (50%) of my professional time."

Simon's deposition testimony that he spent less than half his professional time in actual clinical practice during the 1993 to 1995 period seems to be contradicted by the affidavit.

The inquiry, however, does not end there because Dawson contends that defendants' counsel's overly narrow definition of actual clinical practice accounts for the difference. Hence, it logically ought to follow that application of a proper definition of actual clinical practice will reconcile the estimated percentages of Simon's deposition and affidavit. In an effort to explain why his estimates varied, Simon averred:

"During the deposition of me taken on January 28th, 2000, Defense counsel defined 'clinical practice' as 'patient care' and 'outpatient care.' He asked repeatedly if I spent less than half of my professional time in 'clinical practice' as he defined it. Taking into account only the outpatient care and group therapy I conduct, as I was required to do under the questions he posed, then I appropriately answered that I spent less than fifty percent of my time in clinical practice.

"However, defense counsel ignored my testimony concerning other areas of clinical practice in which I am engaged including governmental evaluations, emergency room duties, increased hours when patients are admitted, clinical supervision at Suburban Hospital, case consultation and suicidality assessment at Suburban Hospital, consultation with other providers and students regarding patient care, grand rounds, and clinical classes I teach to Georgetown students."

In his affidavit, particularly in paragraph 10, Simon perpetuates the failure of the deposition questions and answers to distinguish between January 2000 and 1993 to 1995 activities. Examination of his deposition shows that the items Simon listed in paragraph 10 of the affidavit have little bearing on the percentage of time he devoted to actual clinical practice during the period 1993 to 1995, insofar as can be ascertained:

governmental evaluations — no mention for 1993 to 1995

emergency room duties — "not taking emergency room call" in 1993 to 1995

admitting patients — admitting patients from the emergency room was part of his responsibility as the on-call doctor for the department of psychiatry, he was not taking emergency room on-call duty in 1993 to 1995

clinical supervision at Suburban; and case consultation and assessment at Suburban — time spent in these activities in 1993 to 1995 was less than in 2000. Estimated time Simon spent in those activities in 2000 appears to be approximately 2 hours per month. Hence, less than 2 hours per month.

consultation with other providers and students regarding patient care — no mention for 1993 to 1995

clinical grand rounds — no mention

clinical classes taught at Georgetown — "sporadic," one hour per week for eight weeks; no mention for 1993 to 1995

In summary, from what we can learn from the affidavit, approximately a quarter of an hour per week was all the time that was not taken into account in Dr. Simon's deposition estimate that he spent 30-40% of his working hours in actual clinical practice during the period of 1993 to 1995. An additional quarter of an hour does not significantly increase the percentage of a 50- to 67-hour workweek.

The reasons offered by Simon in paragraph 10 of his affidavit for increasing his estimation of the percentage do not support the change. Thus, his attempt to reconcile his deposition and affidavit percentages fails.

What remains to be considered are paragraphs 3 and 9 of the affidavit in which Dr. Simon estimated that he spent more than 50% of his professional time in actual clinical practice during the period 1993 to 1995. His averments in the affidavit contradict his deposition testimony, where Dr. Simon estimated he devoted 30-40% of his professional time to actual clinical practice during that period.

Dawson's fallback position is that she can resist summary judgment through the use of Simon's affidavit even though it is at odds

with his earlier deposition. She relies on *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 661 P.2d 348 (1983), and purports to quote from *Mays*. In fact, the principle quoted by Dawson was quoted in *Mays*, 233 Kan. at 46, from *Kennett-Murray Corp. v. Bone*, 622 F.2d 887 (5th Cir. 1980), which the court distinguished as involving a clarifying rather than a contradictory affidavit. 233 Kan. at 45-46. The affidavits in *Mays* contradicted the prior deposition testimony and, like the affidavit in the present case, were filed in direct response to the filing of summary judgment motions. 233 Kan. at 46-47. In those circumstances, the court concluded that the trial court properly struck the disputed affidavits. 233 Kan. at 47. *Mays* governs the present case and requires the trial court's striking of Dr. Simon's affidavit to be affirmed.

## PLAINTIFF'S CLAIMS OTHER THAN
## PSYCHIATRIC MALPRACTICE

Defendants sought partial summary judgment on all of Dawson's claims other than the medical malpractice claim "on the general basis that Plaintiff should not be allowed to take what is essentially a malpractice claim and transform it into multiple claims." The district court granted the defendants' motion for partial summary judgment. On Dawson's claims of negligent infliction of emotional distress and outrage, the district court concluded that the proper remedy for all alleged injuries was through the malpractice action. On her claims for money had and received and breach of fiduciary duty, the district court faulted Dawson for resting on her allegations rather than setting forth specific facts that would establish that there was no genuine issue for trial. On her claim of breach of nondelegable duty, the district court concluded that Menninger cannot be held vicariously liable for the actions of Dr. Prager.

Rule 141. On appeal, Dawson argues that her failure to comply with Rule 141 (2002 Kan. Ct. R. Annot. 189) was not a proper basis for the district court's granting summary judgment against her. Rule 141(b) requires any party opposing a motion for summary judgment to state whether each of the movant's factual contentions is controverted, and if so, to supply "a concise summary of conflicting testimony or evidence." The trial court, in fact, did not mention

Rule 141, but quoted K.S.A. 60-256, the statutory counterpart. K.S.A. 60-256(e) provides in part:

"When a motion for summary judgment is made and supported as provided in this section, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this section, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Because Dawson merely denied defendants' contentions of fact and failed to come forward with anything of evidentiary value that would establish a disputed material fact, the district court granted defendants' motion for summary judgment on her claims for money had and received and breach of fiduciary duty.

Dawson alternately argues that defendants' failure to comply with Rule 141 prevented her from complying with the rule or she complied even though defendants did not. Her arguments do not address the basis for the trial court's entry of summary judgment and consequently are unavailing. Moreover, Dawson seems to concede that she did not comply with the statutory requirements. The trial court stated that Dawson failed to come forward with evidence that would establish disputes of fact. In her brief, she attempts to justify her failing to do so:

"[Defendant] merely recited allegations in Plaintiff's petition without support from any factual source. For example, Fact No. 4 indicated: '4. Each of Plaintiff's factual allegations against both Defendants arise out of these Defendants' care and treatment of Plaintiff.' This kind of allegation requires only a denial that the allegations all arose from Defendant's care and treatment."

Money had and received. In her appellate brief, Dawson describes two very different grounds for her claim for money had and received. First, she alleges that, as a matter of contract, she paid for treatment that did her no good. Second, she alleges that defendants' billing mistakes caused her to overpay.

The trial court rejected Dawson's contract theory "to the extent it is connected with Plaintiff's allegations of Defendant's failure to maintain the standard of care required of physicians under the law." The trial court cited *Bonin v. Vannaman*, 261 Kan. 199, 929 P.2d 754 (1996). In that case, Bonin tried to state a cause of action

in fraud against Dr. Vannaman for his failure to diagnose her scoliosis and failure to disclose that a radiologist had noted possible scoliosis in a chest x-ray. Even though the doctor's alleged conduct matched the elements of fraud by silence, the court concluded that Bonin's cause of action was for malpractice, not fraud. The court explained:

"This does not mean that a doctor can never be liable for fraud or breach of contract. Instead, this simply means that a fraud or breach of contract cause of action can only be based upon a physician's misconduct if that misconduct is beyond a breach of the legal duty which every doctor has the obligation to uphold." 261 Kan. at 210.

In the present case, there is no showing that Dawson's contract allegation is based on misconduct that is beyond a breach of legal duty.

The second ground was raised only in Dawson's answer to defendants' counterclaim. The record on appeal does not contain a file-stamped copy of the answer—the copy in the record on appeal is attached to a motion for leave to file it. The district court observed in its decision that "Plaintiff's petition fails to allege that Plaintiff was improperly billed for services rendered." In addition, in her opposition to·defendants' motion for summary judgment, Dawson did not satisfy the K.S.A. 60-256 requirement that she demonstrate improper billing with specific facts and supporting documentation. In her brief on appeal, Dawson asserts that "[i]t appears from the records that Menninger Clinics, Inc. engaged in billing irregularities concerning plaintiff," and the citation she gives for the assertion is "*See infra* Section IV." Section IV of her brief is the statement of facts, where Dawson primarily sets out her contentions of billing irregularities rather than facts. Examination of the citations to the record on appeal contained in the portion of the statement of facts that addresses billing reveals only contentions, nothing of evidentiary value.

Outrage. According to the trial court, Dawson alleged in support of her claim for the tort of outrage (intentional infliction of emotional distress) that "Dr. Prager failed to keep appropriate boundaries, failed to protect plaintiff from her own self-destructiveness, abruptly abandoned her relationship with Plaintiff and was negli-

gent in handling the therapeutic process." On defendant's motion for summary judgment, the trial court considered materials outside the pleadings and examined Dawson's allegations, considering their sufficiency and how they related to the malpractice claim before concluding that summary judgment was proper on the claim of outrage.

Accepting Dawson's allegations as true, the trial court considered whether they were sufficient to establish the threshold requirements for liability for the tort of outrage.

Comparing the allegations in the present case with the circumstances of *Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024 (1991), and *Gomez v. Hug*, 7 Kan. App. 2d 603, 645 P.2d 916, *rev. denied* 231 Kan. 800 (1982), the district court concluded that Prager's alleged conduct may not reasonably be regarded as so extreme and outrageous as to meet the threshold requirements for submission to a jury. In addition, the district court found that the alleged conduct, "while certainly a potential cause of action for malpractice, would not rise to the level of outrageous. The allegations point to a substandard of care but not extreme and outrageous under the law."

We agree. Because Dawson's allegations stated a cause of action for malpractice, the trial court returned to the principle of *Bonin*, 261 Kan. 199, which disapproved theories of recovery against a physician to the extent they are connected with plaintiff's allegations of defendant's failure to maintain the medical standard of care. The trial court concluded that adequate remedies for Dawson's alleged emotional distress were available under the tort of medical negligence and that her allegation remained an action for malpractice, not one for outrage.

On appeal, Dawson argues that *Bonin* does not stand for the principle that intentional acts are subsumed within the malpractice action. Dawson's argument is meritless. The cause of action at issue in *Bonin* was fraud, an intentional act. 261 Kan. at 210.

Breach of fiduciary duty and breach of nondelegable duty. On appeal, Dawson merely asserts that these torts are not subsumed by the malpractice cause of action. The district court entered summary judgment in favor of defendants on these claims. On the breach of fiduciary duty claim against Prager, the district court

noted that Dawson provided nothing of evidentiary value and concluded that Dawson's "mere allegations are not enough under K.S.A. 60-256 to demonstrate that a viable claim exists and survive summary judgment." On the breach of nondelegable duty against Menninger, the district court held that K.S.A. 40-3403(h) precluded Menninger, a health care provider within the meaning of K.S.A. 40-3401(f), from being held vicariously liable for the actions of Dr. Prager. K.S.A. 2002 Supp. 40-3403(h) provides in part:

"A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund."

Dawson, on appeal, has not addressed applicability or meaning of the statute.

## SUMMARY JUDGMENT AGAINST PLAINTIFF ON DEFENDANTS' COUNTERCLAIM

On Menninger's motion for summary judgment on its counterclaim for unpaid medical bills, the district court granted summary judgment. In its Memorandum Decision and Order, the district court made the following findings of fact:

"1. Beginning on or about July 6, 1992, . . . Dawson first came under the psychiatric and medical treatment and care of Menninger. Menninger agreed to provide such treatment to Dawson.
"2. The services and charges provided to Dawson by Menninger were reasonable and necessary.
"3. After Medicare payments, the principal balance due and owing Menninger by Dawson for services provided is $21,217.69.
"4. Dawson has not paid this outstanding balance."

Menninger attached the itemized billing for services to its motion. The district court accepted Menninger's statement of uncontroverted facts and deemed those facts admitted because Dawson failed to set forth any conflicting testimony or evidence. Examination of the record shows that Dawson opposed Menninger's motion for summary judgment on its counterclaim by denying that she owed anything and arguing that Menninger had not established

the debt with sufficient particularity to warrant the entry of judgment. Menninger attached an affidavit to its reply. The affiant is the supervisor of patient accounts at Menninger. The affiant reviewed Dawson's account; spelled out which months Dawson was uninsured and when she was covered by Prudential, Blue Cross, and Medicare; and concluded that the "balance due for services provided during the period April, 1994, through May, 1995, represent Kansas Blue Cross/Blue Shield and Medicare co-payments due from the patient Marian Dawson." The record on appeal contains no response by Dawson.

Among the arguments made by Dawson in opposing the motion were that she had no contract with Menninger and that Menninger is not entitled to the difference between its actual costs of services and insurance payments made on her behalf. She pursues these two arguments on appeal.

With regard to her denial of a contract argument, the district court faulted Dawson because, even though she admitted being treated by Menninger, she offered no factual support for her failure and refusal to pay the balance of her bill. On appeal, Dawson contends that her denial of a contract is sufficient because Menninger failed either to plead the existence of a contract or to attach the contract to its counterclaim as required by K.S.A. 60-209(h). It appears that Menninger satisfied the statutory requirement by "reasonably identifying" the written instrument upon which the counterclaim was founded. K.S.A. 60-209(h). Menninger alleged that Dawson "signed a written contract to pay for services provided by Defendant to Plaintiff in Kansas," and "[a]lternatively, the Plaintiff is indebted to the Defendant . . . under the theory of *quantum meruit.*"

In any event, in her appellate brief, Dawson also argues that at various times she has had different contracts with Menninger. She states that her contracts have differed due to her changing insurance carriers and at times being uninsured. In this regard, she argues that Menninger has failed to show the various contracts. What her argument seems to boil down to is that the portion of billed services she is responsible for differed from time to time depending on her insurance and she disputes Menninger's com-

putation of the amount she owes. Hence, due to Dawson's failure in opposing Menninger's motion to set forth specific facts showing that there is a genuine issue as to the amount owed, it was appropriate for the district court to grant summary judgment.

Dawson contends that comparison of the affidavit of Menninger's supervisor of patient accounts with the itemized billing shows that she owes nothing. Specifically, she challenges affiant's statement that the $21,217.69 balance is the copayments from Blue Cross and Medicare coverage. She claims she "regularly" paid her Blue Cross copayments of $19.10 and directs the court's attention to one page of Menninger's itemized billing where six credits of $19.10 are recorded for the period March 3-16, 1994. Dawson's position seems to be that this information is sufficient to show that she owes no Blue Cross copayments, but it only shows that she paid a certain amount in March 1994. Dawson's position on her Medicare copayments is built on her premise that she has completely paid her Blue Cross copayments so that the entire $21,217.69 represents Medicare copayments. The premise has not been established.

Affirmed.

ABBOTT, J., not participating.

BRAZIL, S.J., assigned

ALLEGRUCCI and DAVIS, JJ., dissenting.